### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

BRIAN SCHAAP,

               Plaintiff,

          v.                                      CAUSE NO.: 2:20-CV-143-TLS

COMMANDER LOUIS ARCURI, JR.,
OFFICER ARCIDES SANTIAGO,
OFFICER SAYRA JIMINEZ-SEGOVIA,
OFFICER JE SANCHEZ, BENYAMA
DONTE MORMAN BELL, and CITY OF
EAST CHICAGO, INDIANA,

               Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants East Chicago Police Officers' Motion for Summary Judgment [ECF No. 76], filed on June 30, 2022, and Defendant, City of East Chicago's, Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 and N.D. Ind. L.R. 56-1 [ECF No. 79], filed on June 30, 2022.

On July 9, 2020, the Plaintiff filed a Second Amended Complaint [ECF No. 36] against the Defendants Commander Louis Arcuri, Jr., Officer Arcides Santiago, Officer Je Sanchez, Officer Sayra Jiminez-Segovia (collectively, "Defendant Officers"), Benyama Donte Morman Bell, and the City of East Chicago, Indiana ("Defendant City"). In his Second Amended Complaint, the Plaintiff brings claims against the Defendants in relation to an incident in which he was attacked while the Defendant Officers were present. The Plaintiff claims that he is entitled, under the Fourteenth Amendment, to life, liberty, and the pursuit of happiness, that those rights are enforceable under 42 U.S.C. § 1983, and that the Defendant Officers, while acting under color of law, failed to protect those rights held by the Plaintiff (Count I). Second

Am. Compl. ¶¶ 17–22, ECF No. 36. The Plaintiff also claims that the Defendant Officers'
restraint and control over the Plaintiff imposed upon the Defendant City of East Chicago a duty
to assume responsibility for the Plaintiff's safety, a duty the Defendant City of East Chicago
violated through the failures and omissions of the Defendant Officers (Count II). *Id.* ¶¶ 24–28
The parties completed the discovery period on February 16, 2022.

The Defendant Officers and the Defendant City of East Chicago filed their motions for
summary judgment on June 30, 2022. ECF Nos. 76, 79. The Plaintiff filed responses to the
motions on July 27, 2022. ECF Nos. 83, 84. The Defendant City of East Chicago filed a reply on
August 10, 2022. ECF No. 89. The Defendant Officers did not file a reply, and the time to do so
has passed. For the reasons set forth below, the Court grants the motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an
absence of evidence supporting an essential element of the non-moving party's claim; or (2)
presenting affirmative evidence that negates an essential element of the non-moving party's
claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016)
(citation omitted). In response, the non-movant "must make a sufficient showing on every
element of [her] case on which [she] bears the burden of proof; if [she] fails to do so, there is no
issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must construe all facts and draw
all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation
omitted). The court's role "is not to sift through the evidence, pondering the nuances and

inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## VALIDITY OF THE PLAINTIFF'S RESPONSE

As a preliminary matter, the Defendant City requests that the Court enter summary judgment in its favor because the Plaintiff's response does not comply with the local rules. Northern District of Indiana Local Rule 56-1(b) requires a party opposing summary judgment to separately file:

(1) A response brief; and
(2) a Response to Statement of Material Facts which includes:
    (A) a verbatim restatement of the Statement of Material Facts;
    (B) a correspondingly numbered response immediately following each paragraph of the Statement of Material Facts;
    (C) a citation to evidence supporting each dispute of fact; and
    (D) additional facts in a section titled Additional Material Facts with numbered paragraphs continuing the sequential numbering of the Statement of Material Facts for each additional material fact the opposing party contends is undisputed which includes:
        (i) a short statement of each fact; and
        (ii) a citation to evidence supporting each fact.

The Plaintiff has filed a response [ECF No. 83], a brief supporting his response [ECF No. 85], which consists of 37 paragraphs of factual allegations, and an appendix to his response [ECF No. 88], which includes, among other things, a verbatim restatement of the Defendant City's Statement of Material Facts, non-numbered responses immediately following each paragraph of the Statement of Material Facts, citations to evidence supporting each dispute of fact, and legal arguments responding to the Defendant City's brief.

The Defendant City is correct that the Plaintiff did not comply with the Court's local rules. The legal arguments that would normally be in the Plaintiff's response brief are contained in the Plaintiff's appendix. The Plaintiff did not file a "Response to Statement of Material Facts," and instead he filed an appendix that contains, within 150 pages of facts, arguments, and evidence, a "Statement of Genuine Disputes." *See* ECF No. 88. The Plaintiff did not include his "Additional Material Facts" within the "Statement of Genuine Disputes," and instead he alleged additional facts in his "Brief in Support of His Response." *See* ECF Nos. 85, 86.

Nonetheless, the Court accepts the Plaintiff's materials and reaches the merits of the motions for summary judgment because it is not "impossible to tell . . . the proposed [facts] with which [the Plaintiff] disagrees." *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020). Although the Plaintiff's materials opposing summary judgment have not been filed or labeled in accordance with Rule 56-1, the Plaintiff's filings do permit the Court to identify the facts he disputes, the evidence cited in support of those disputes, the Plaintiff's additional facts, and his legal arguments. *Cf. Waldridge*, 24 F.3d at 922 (sustaining summary judgment because the non-movant did not "make any effort to identify with specificity what factual issues were disputed, let alone supply the requisite citations to the evidentiary record"); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010), 969 F.3d at 349 (sustaining summary judgment because the "statement of facts did contain some pinpoint citations [but] did not directly respond to [the moving party's] proposed findings and lumped several distinct factual assertions together in each paragraph").

## EVIDENTIARY OBJECTIONS

The Defendant City disputes multiple of the Plaintiff's facts as alleged in ECF Nos. 85 and 86. First, the Defendant City disputes certain facts on the grounds that the allegations are

supported only by the Plaintiff's own affidavit, which the Defendant City argues contradicts the Plaintiff's prior deposition testimony. "In [the Seventh Circuit,] the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *Davis v. ArcelorMittal USA, LLC*, No 2:18-CV-318, 2021 WL 848106, at *6 (N.D. Ind. Mar. 5, 2021) (quoting *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020)). Here, however, the Defendant City has not shown that the referenced allegations contradict the Plaintiff's prior testimony, only that the Plaintiff did not testify as to these details in his deposition. Further details supplied in the affidavit, "without more, [do] not subject the [affidavit] to the sham affidavit rule." *Phillips v. United Airlines, Inc.*, No. 20 C 3333, 2021 WL 4192071, at *2 (N.D. Ill. Sept. 15, 2021) (citing *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015) ("[The] affidavit was amplification rather than contradiction, and so was not within the 'sham' exclusionary rule.")). Accordingly, the Court denies the Defendant City's objections to the Plaintiff's ¶¶ 1, 9, 10, 12, 19, 22, 24, 25, 27, and 35.

The Court finds that Plaintiff's ¶¶ 2 and 3, supported by the Plaintiff's July 21, 2022 affidavit, are contradicted by the Plaintiff's prior testimony from November 17, 2021. The Court must therefore exclude ¶¶ 2 and 3 from the facts. *See Hale*, 959 F.3d at 316. The Court also excludes Plaintiff's ¶¶ 14, 16, and 28 as unsupported by the record evidence.

## MATERIAL FACTS[1]

On March 25, 2019, the Plaintiff was driving a tractor trailer in a northbound direction on Indianapolis Boulevard at its intersection with 148th Street in East Chicago, Indiana. ECF No. 88

---

[1] The material facts are taken from the Defendants East Chicago Police Officers' Memorandum in Support of Motion for Summary Judgment [ECF No. 77], the Defendant, City of East Chicago's, Statement of Material Facts [ECF No. 80], and the Plaintiff's briefs in support of his responses to the Defendants' motions for summary judgment [ECF Nos. 85, 86]. The Defendant Officers' Exhibits A–F can be found at ECF Nos. 78-1–6, the Defendant City's Exhibits 1–4 can be found at ECF Nos. 82-1–4, and the Defendant City's Exhibits A and B can be found at ECF No. 90. The Plaintiff designated evidence

at 46, ¶ 2. The Plaintiff was involved in a motor vehicle collision with Ms. Shantina Barlow at that intersection. Second Am. Compl. ¶ 11, ECF No. 36; ECF No. 77 ¶ 2; ECF No. 80 ¶ 7.

All Defendant Officers were acting within the scope of their employment at this time. Def. Officers' Answer ¶¶ 5–8, ECF No. 41. Commander Arcuri was the Commander of the East Chicago Police Department Patrol Division at the time of the accident. ECF No. 88 at 53:11–18. While on duty and in his squad car, Commander Arcuri came to the scene of the collision a few moments after it occurred. *Id.* at 54:5–10, 64:10–12. As a result of Commander Arcuri's conversation with the dispatcher, the Defendant Officers—Officers Sanchez, Santiago, and Jiminez-Segovia—responded to the scene and began an investigation. *Id.* at 46, ¶ 4, 55:17–19.

The Plaintiff was not advised by any officer that he could not leave or that he was being restrained at the scene. Def. Ex. 4 at 20:15–18, 20:23–25. The Plaintiff, having been a truck driver for many years, knew he could not leave the scene of the collision until the police investigation was complete and the officers released him. ECF No. 88 at 46, ¶ 5. Commander Arcuri testified that the Plaintiff had to stay at the crash scene and give his reports because leaving would constitute a hit and run. ECF No. 88 at 59:3–12. Commander Arcuri testified that the Plaintiff was not in police custody; he was required to stay on the crash scene to complete a crash report. Def. Ex. C at 69:25–70:12. Officer Santiago also testified that "[i]t would be a hit and run if [the Plaintiff] left." ECF No. 88 at 81:10. Officer Santiago did ask the Plaintiff to stand by his vehicle and wait for him to come get information on the Plaintiff's truck. Def. Ex. F at 31:13–32:5.

Officer Sanchez arrived at the scene and saw a gentleman that was upset, and Officer Sanchez directed his attention to the man because he seemed irate. Def. Ex. 2 p. 20:8–16.

---

in support of his response in a combined "appendix," which includes an affidavit, deposition transcripts, and an expert's report and curriculum vitae, all of which can be found at ECF No. 88.

Defendant Bell, in the presence of Officer Sanchez, walked up to the Plaintiff and yelled threats such as "that's my mama man. He better pay. I don't give a fuck if I'm in front of the police. I'll knock you the fuck out." ECF No. 88 at 46, ¶ 6; *Id.* at 88:25–89:4. Officer Santiago could not recall whether Defendant Bell made those statements, *id.* at 75:21–76:9, but he did testify to hearing Defendant Bell yelling something to the effect of, "you almost killed my mother," *id.* at 73:14–16. For the next fifteen minutes, Defendant Bell, while never more than five to six feet away from the Plaintiff and in the presence of Officer Sanchez, cursed at the Plaintiff and threatened to attack him. *Id.* at 47, ¶¶ 8, 12. Officer Sanchez testified that Defendant Bell was "extremely irate and screaming." *Id.* at 88:21–24. Officer Sanchez saw Defendant Bell upset and heard him screaming out in the open by himself, near the building where the accident occurred. Def. Ex. 2 at 21:9–22, 22:7–11. Officer Sanchez focused on Defendant Bell and did not see the driver of the truck, the Plaintiff. *Id.* at 22:12–18. Officer Sanchez used his training from crowd control and de-escalation training to calm Defendant Bell. *Id.* at 47:5–8. Officer Sanchez was able to calm Defendant Bell down for three to five minutes. *Id.* at 28:22–29:4.

Defendant Bell did not get physical with Officer Sanchez, and Officer Sanchez did not have to touch Defendant Bell to calm him down. *Id.* at 48:1–6. Defendant Bell did not say anything inflammatory toward Officer Sanchez, and Officer Sanchez did not know who Defendant Bell was talking about when he made statements using derogatory language. *Id.* at 48:7–14. Officer Sanchez did not know who Defendant Bell was screaming at, and Officer Sanchez did everything he could, using his training, to calm Defendant Bell down. *Id.* at 49:14–50:2. There was no indication that led Officer Sanchez to believe Defendant Bell would do anything, nor was there any indication, once Defendant Bell stopped yelling, that he was going to run away from where he was standing. *Id.* at 47:9–15.

At the scene of the accident, the Plaintiff heard an officer asking Defendant Bell to calm down so they could take care of Defendant Bell's mother. Def. Ex. 4 at 13:13–16, 16:22–24, 23:8–11. When asked if he observed whether Defendant Bell calmed down, the Plaintiff responded, "He did, and then he'd start back up again." *Id.* at 14:9–11, 16:25–17:2; ECF No. 88 at 66:10–13. The Plaintiff states in his affidavit, "When Mr. Bell was not yelling threats at me, [Defendant Bell] was looking at me as if he wanted to kill me." ECF No. 88 at 47, ¶ 9. The Plaintiff alleges that Defendant Bell was never calm. He alleges, "Trying to calm Mr. Bell down failed," and, "Mr. Bell ignored the officer and continued, off and on, for approximately 15 minutes to curse at me and threaten to attack me." *Id.* at 47, ¶¶ 7–8, 66:10–13.

When Officer Jiminez-Segovia arrived at the accident, she observed Officer Sanchez speaking with a male, later identified as Defendant Bell. Def. Ex. 3 at 17:11–18. Officer Jiminez-Segovia noted that Defendant Bell was frustrated, but it appeared that Officer Sanchez calmed him down. *Id.* at 44:4–7. When asked whether she could say if Defendant Bell was angry, Officer Jiminez-Segovia testified that she could not "describe that emotion for Bell. I can't speak for Bell on what emotion he felt." ECF No. 88 at 107:8–11. She testified that Officer Sanchez "was attempting to . . . or appear[ed] to [have] calm[ed] [Defendant Bell] down." Def. Ex. 3 at 44:4–7.

The Defendant Officers did not remove Defendant Bell from the scene or from the Plaintiff's immediate presence, nor did they escort him back into the apartment building, place him into one of the four squad cars, search him for weapons, handcuff him, or take the Plaintiff to a safe location away from Defendant Bell. ECF No. 88 at 47, ¶ 13, 68:2–12, 96:5–15. When asked why he did not place Defendant Bell in a squad car, Officer Santiago testified that he did not do so because Defendant Bell had not broken any laws. *Id.* at 96:5–7, 100:25–101:6. Chief

Hector Rosario testified that Defendant Bell's statements constituted "intimidation," and when asked if that was against the law, Chief Rosario answered, "Correct." *Id.* at 117:13–18.

As a result of Defendant Bell's anger and threats, the Plaintiff was afraid and thought he could be attacked at any moment. *Id.* at 47, ¶ 14, 67:25–68:1. Because the Plaintiff was done giving information to the officer, because Defendant Bell was threatening him, and because the Plaintiff was scared, the Plaintiff went to his truck. *Id.* at 67:12–68:1. As the Plaintiff was walking to his truck, he did not hear anyone yelling at him or threatening him, he did not see anyone come up behind him, and he did not hear any kind of warning that someone was approaching him. Def. Ex. 4 at 17:12–16, 18:5–7, 20:2–5. The Plaintiff did not know how anyone would know, given that Defendant Bell gave no warning, that Defendant Bell was going to attack him. *Id.* at 29:3–6. The Plaintiff never told any of the officers at the scene that he did not feel safe, and the officers did not know that the Plaintiff did not feel safe. *Id.* at 29:13–15, 29:22–23, 30:25–31:7. The Plaintiff did not tell any of the officers at the scene that he was concerned about Defendant Bell doing anything to him, nor did he express any concerns about Defendant Bell's behavior toward him. *Id.* at 76:4–10.

The Plaintiff was not immediately attacked by Defendant Bell after Defendant Bell calmed down. *Id.* at 27:23–25. Defendant Bell stopped screaming and stood for about three minutes before he took off running. Def. Ex. 2 at 29:13–23. Defendant Bell chased after the Plaintiff, running from Officers Sanchez and Jiminez-Segovia and past Officer Santiago. ECF No. 88 at 78:20, 90:17–23, 108:2–24, 47, ¶ 16. None of the officers yelled to the Plaintiff or alerted him to the fact that Defendant Bell was running at him. *Id.* at 47, ¶ 17, 97:17–22. Officer Sanchez had no idea what Defendant Bell was going to do once Defendant Bell started running. Def. Ex. 2 at 47:19–21. When Defendant Bell took off running, it happened in a split second and

without warning. *Id.* at 52:12–20. Defendant Bell attacked the Plaintiff and knocked him out. ECF No. 88 at 47, ¶ 18.

Officer Jiminez-Segovia attempted to stop Defendant Bell, running after him as soon as he took off. Def. Ex. 3 at 32:21–25. Defendant Bell was faster than both Officers Sanchez and Jiminez-Segovia. *Id.* at 46:11–15. There was no warning that Defendant Bell was going to do anything to the Plaintiff. *Id.* at 43:22–25. Officer Sanchez did not know why Defendant Bell ran but he gave chase when he saw Defendant Bell run toward the truck driver and hit him. Def. Ex. 2 at 33:7–17. After Defendant Bell hit the truck driver, Defendant Bell did not try to run from Officer Sanchez. *Id.* at 53:21–23. Officer Sanchez placed Defendant Bell under arrest after Defendant Bell struck the Plaintiff, after Defendant Bell committed a crime. *Id.* at 41:7–9.

According to the Plaintiff's affidavit, the three investigating officers and Commander Arcuri "had to have heard what Defendant Bell was saying but did nothing to stop him." ECF No. 88 at 47, ¶ 10. During the fifteen-minute incident, Officer Sanchez stood with Defendant Bell. *Id.* at 98:8–14. Officer Jiminez-Segovia testified that when Defendant Bell took off, she was "between the building and . . . the car." *Id.* at 108:2–3. She testified that she was standing about four feet from Defendant Bell. *Id.* at 111:1–13. Neither Officer Jiminez-Segovia nor Officer Sanchez had placed themselves between Defendant Bell and the Plaintiff. *Id.* at 108:25–109:2.

Officer Sanchez, when asked, "You didn't give chase until [Defendant Bell] hit [the Plaintiff]?" responded, "I [did not] know where he was running to." *Id.* at 91:18–19. Officer Jiminez-Segovia testified that she and Officer Sanchez immediately pursued Defendant Bell as soon as he took off, *id.* at 110:21–25, but Officer Sanchez testified that he chased Defendant Bell after Defendant Bell struck the Plaintiff, *id.* at 92:2–4.

The Plaintiff was taken to St. Catherine Hospital and from there transferred to the

University of Chicago Hospital. *Id.* at 47, ¶ 19. The Plaintiff suffered "right frontal subarachnoid

hemorrhage. Sphenoid bone fracture. Right zygomaticomaxillary complex fracture. Right facial

laceration. Right acromioclavicular joint separation. Right posterior 3rd and 4th rib fractures.

Right anterior 2nd rib fracture. And left-sided manubrial fracture." *Id.* at 138:14–139:1. On May

8th, 2020, the Plaintiff underwent surgery on his clavicle. *Id.* at 144:11–145:5.

### ANALYSIS

Section 1983 provides, in pertinent part, that "[e]very person who, under color of [state

law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

party injured in an action at law." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff

must show that the defendant deprived him of a federal constitutional right and that the

defendant acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

The Plaintiff claims that the Defendant Officers violated his Fourteenth Amendment

rights to life, liberty, and the pursuit of happiness by failing to protect the Plaintiff from being

attacked by Defendant Bell. The Defendant Officers the Defendant City argue that they did not

violate the Plaintiff's rights because they were under no duty to prevent Defendant Bell from

attacking the Plaintiff.

The Supreme Court has held that the purpose of the Fourteenth Amendment is "to protect

the people from the State, not to ensure that the State protect[s] them from each other."

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 195 (1989). "The Due Process

Clause of the Fourteenth Amendment 'generally does not impose upon the state a duty to protect

individuals from harm by private actors.'" *Jackson v. Indian Prairie School Dist. 204*, 653 F.3d

647, 654 (7th Cir. 2011) (citing *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827

(7th Cir. 2009)). There are two exceptions to the general rule: the State has a duty to protect

someone with whom it has a "special relationship," meaning "the state has custody of the person,

thus cutting off alternate avenues of aid"; and the State has a duty to protect when there is a

"state-created danger," when the State "affirmatively places a particular individual in a position

of danger the individual would not otherwise have faced." *Monfils v. Taylor*, 165 F.3d 511, 516

(7th Cir. 1998) (citations omitted). For the Plaintiff's § 1983 claims to survive summary

judgment, he must show that at least one of the two exceptions applied to his situation, thereby

imposing on the Defendants a constitutional duty to protect him from harm.

## A.      Special Relationship Arising from Custody or Control

The Plaintiff has not shown a special relationship with the State arising from the State's

custody or control over him. As the Supreme Court stated in *DeShaney*, the State owes a duty to

protect "when the State by the affirmative exercise of its power so restrains an individual's

liberty that it renders him unable to care for himself, and at the same time fails to provide for his

basic human needs." 489 U.S. at 200. In *Monfils*, the Seventh Circuit explained that special

relationship cases typically involve "prisoners, involuntarily committed mentally ill persons, or

foster children," and "[t]he state's duty to protect those persons . . . arises from that custody or

control." 165 F.3d at 517; *see also Est. of Sinthasomphone v. City of Milwaukee*, 838 F. Supp.

1320, 1325 (E.D. Wis. 1993) ("A special relationship exists . . . when the State takes a person

into its custody and holds him there against his will." (quotation marks omitted)). The Plaintiff

was not in State custody. Thus, for him "to claim a special relationship, he must at least claim

that the state had sufficient control to cut off other avenues of aid." *Monfils*, 165 F.3d at 517. He

has not done so.

The Plaintiff argues that seizure by the police constitutes sufficient State control to impose on the State a duty to protect the person seized, and that the Defendant Officers seized the Plaintiff. The Plaintiff cites *Michigan v. Summers*, 452 U.S. 692 (1981), for the proposition that an officer seizes a person by accosting an individual and restraining his freedom to walk away. *Summers*, however, is not analogous to this case. It involved a man detained at the steps of his house when police executed a warrant to search the house. 452 U.S. at 693. The Supreme Court's holding focused on the reasonableness of the seizure, not whether the man was in state custody or control. *Id.* at 700–01.

Notwithstanding *Summers*, the Plaintiff argues that a special relationship existed because the Defendant Officers "seized" the Plaintiff. But whether a seizure occurred and whether the Defendant officers restrained or controlled the Plaintiff are separate questions. The question of seizure is governed by the Supreme Court's interpretation of the 4th Amendment, and the question whether the State exercised control sufficient to create a duty to protect is governed by *DeShaney* and its progeny. The Plaintiff has not shown any case law to suggest a 4th Amendment seizure constitutes State custody or control for purposes of *DeShaney*. To the contrary, in *Forrester v. Stanley*, the Middle District of Florida explained that "it is not clear that a state actor has an affirmative duty to protect a person from physical harm under the Fourteenth Amendment merely because that person is 'seized' as defined in the Fourth Amendment." No. 6:10-CV-185, 2010 WL 1257471, at *3 (M.D. Fla. Mar. 29, 2010) (citing *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999) ("[T]he only relationships that automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships, such as those which arise from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives

individuals of their liberty and thus of their ability to take care of themselves.")). Even if the Defendant Officers' presence at the accident scene and the Plaintiff's legal obligation to remain there did constitute a 4th Amendment seizure, a showing of a 4th Amendment seizure is not enough to demonstrate a special relationship between the State and the Plaintiff under *DeShaney*.

The Plaintiff argues that he was detained, that the Defendant Officers restrained his freedom to walk away, that the Defendant City by its affirmative action restrained the Plaintiff's liberty, and that he was under control of the Defendant City. He argues that this case is similar to *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989), in which the Third Circuit found a special relationship between the State and a club's employee. In *Horton*, a former police officer turned club owner, one who had a reputation for violence, was interrogating one of his employees about a recent burglary of the club. *Id.* at 458. The employee was beaten by the club owner and a DJ. *Id.* at 456. The owner "subjected the employee to restraint of his liberty" and called the police for help. *Id.* at 458. The police confirmed that the employee would be left in the club owner's "good hands." *Id.* at 456. A sergeant arrived at the club, interrogated the employee, and instructed the employee to remain at the club while the sergeant left to investigate the employee's story. *Id.* After the sergeant left, the employee received another severe beating. *Id.* The employee later died from his injuries. *Id.* at 457.

The Third Circuit concluded that the sergeant's "arrival, his interrogation, his direction to [the victim] to remain seated while he went next door to investigate [the employee's] story, and his refusal to remove [the employee] from the club significantly changed the nature of the custody." *Id.* at 458. It found that the sergeant's role was not passive, but that "he used his official status to confirm that [the club owner] was free to continue his custodial interrogation even though [the employee] was in fear for his safety and wanted to leave." *Id.*

There are key factual distinctions between *Horton* and this case that warrant a different outcome here. The Plaintiff in this case was not "subjected . . . to restraint of his liberty" when the police arrived at the accident scene. The Plaintiff did know that the law required him to remain at the scene of the accident, but confinement to the accident scene is not the same as the employee's restraint and beating by the club owner (his boss) and a DJ inside the club, condoned by the sergeant. The Plaintiff's movement appeared to be limited when Officer Santiago asked him to stand by his vehicle and wait for Officer Santiago to come get information on his truck. However, the facts show that the Plaintiff was done giving information to the officers, was away from his truck, and was walking back to his truck when Defendant Bell attacked him. The Plaintiff was free to move, at least around the accident scene, at the time he was attacked. The Plaintiff's freedom to move suggests the State did not have "sufficient control to cut off other avenues of aid." *Monfils*, 165 F.3d at 517. In fact, it appears the Plaintiff was attempting to avail himself of one "avenue[] of aid," his truck, when he was attacked.

The outcome the Court reaches may have been different if the Plaintiff had expressed to the Defendant Officers a "fear for his safety and [desire] to leave," as the employee did in *Horton*, and the Defendant Officers required the Plaintiff to remain exposed to a known danger against his will, as the sergeant did in *Horton*. The outcome may also have been different had the Defendant Officers condoned Defendant Bell's behavior, as the sergeant did in *Horton*. Here, however, the Defendant Officers attempted to calm Defendant Bell down and apprehended him when he attacked the Plaintiff.

The Court finds *Estate of Stevens v. City of Green Bay*, instructive. In *Estate of Stevens*, the police quelled a fight in a Green Bay night club that involved the victim. 105 F.3d 1169, 1170–71 (7th Cir. 1997) The police took the victim to a public telephone to call a cab. *Id.* at

1171. Ninety minutes later, a car struck and killed the victim while he walked in the middle of a street in Green Bay. *Id.* The victim's estate argued the victim had a constitutional right to protective services that the police officers denied him. *Id.* at 1174.

The Seventh Circuit evaluated whether the State had a special relationship with the victim that gave rise to a duty to protect him. *Id.* at 1174–75. The court explained that "[t]o determine whether someone was 'in custody' under the Fourth Amendment, a court examines the objective circumstances of the situation using the perspective of a reasonable person in the suspect's position. . . . We are to consider the totality of the circumstances involved when making this determination." *Id.* at 1175 (citations omitted). The court concluded that the victim was not in custody when the officers placed him in a squad car to take him to a nearby public telephone:

> [N]either of the officers indicated to [the victim] that he was under arrest . . . . [He] was not handcuffed. The officers did not give him *Miranda* warnings. The child-safety lock on the rear passenger compartment which would have prevent him from exiting was disengaged. Upon arriving at the gas station, [the victim] left the squad car voluntarily and thanked [the officer] for the ride.

*Id.* at 1176.

Here, the Plaintiff also was not under arrest, handcuffed, or given *Miranda* warnings. Officer Santiago asked the Plaintiff to stand by his truck and wait for Officer Santiago to come get information on his truck. But the Plaintiff testified he was done giving information to the Defendant Officers and began walking back to his truck. The Plaintiff was not restrained, and, having finished giving the Defendant Officers information, he may have been free to leave the accident scene altogether. Considering the totality of the circumstances and applicable case law, the Court cannot say that the Plaintiff was in State custody or control that imposed upon the State a duty to protect the Plaintiff from harm.

### B.    State-Created Danger

Nor has the Plaintiff established that the State-created danger exception applies. To establish that the State-created-danger exception applies, the Plaintiff must show that the State, "by its affirmative acts . . . create[d] or increase[d] a danger faced by [the Plaintiff]," that the State's failure "to protect [the Plaintiff] from such a danger [was] the proximate cause" of the Plaintiff's injury, and that "the state's failure to protect [the Plaintiff] . . . shock[ed] the conscience." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007) (citations omitted); *see also Bright v. Westmoreland County*, 443 F.3d 276, 282 (3d Cir. 2006) ("It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.").

The Seventh Circuit has explained that liability under the State-created danger theory attaches in "rare and often egregious" circumstances. *Doe v. Village of Arlington Heights*, 782 F.3d 911 (7th Cir. 2015); *see White v. Rochford*, 592 F.2d 381, 382 (7th Cir. 1979) (finding a State-created danger where the police arrested a driver for drag racing and left the children passengers stranded in the car on a busy highway on a cold night); *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993) (finding a State-created danger where police arrested a sober driver and left behind an obviously drunk passenger with the keys to the vehicle); *Paine v. Cason*, 678 F.3d 500, 511 (7th Cir. 2012) (finding a State-created danger where police arrested a woman in a safe place and released her in a hazardous area while she was unable to protect herself).

The State-created danger exception does not apply here because the Plaintiff has not shown that the State created or increased a danger to the Plaintiff and thereby assumed a duty to protect him from it. The only evidence the Plaintiff cites in support of this theory is Officer Santiago's testimony that the Plaintiff could not leave the scene of the accident until the

investigation was complete. However, the Plaintiff has not alleged any affirmative action on the part of the State that posed a danger to him. The Plaintiff was not advised by any officer that he could not leave the scene or that he was being restrained. Officer Santiago asked the Plaintiff to wait by his truck for Officer Santiago to come get information from him, but the facts show that the Plaintiff had subsequently moved away from his truck and was done giving information to the Defendant Officers when he was attacked.

The Defendant Officers may have failed to intervene before Defendant Bell attacked the Plaintiff, but such inaction did not create or increase the danger to the Plaintiff. *See Losinski v. County of Trempealeau*, 946 F.2d 544, 550–51 (7th Cir. 1991) (declining to apply either of the two *DeShaney* exceptions where a police officer accompanied a woman to pick up belongings from a trailer and failed to intervene when the trailer's resident argued with and shot the woman); *see also Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699–700 (9th Cir. 1988) (declining to apply a *DeShaney* exception where the police received multiple reports of harassment and vandalism from a woman about her estranged husband but ignored requests for protection and investigation).

The Defendants also did not "subject [the Plaintiff] involuntarily to an existing danger." *Losinski*, 946 F.2d at 550–51. None of the Defendant Officers told the Plaintiff he could not leave. In his affidavit, the Plaintiff explained that he knew he could not leave the scene of the collision until the police investigation was complete and the Defendant Officers released him. And, the Plaintiff has not alleged that once at the scene, the Defendant Officers made him more vulnerable to Defendant Bell's attack than he was otherwise. *See DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to

them."). On these facts, the Court cannot say that the State "create[d] or increase[d] a danger faced by" the Plaintiff. *King ex rel. King*, 496 F.3d at 817–18.

Even were the Court to find that the Defendant Officers increased the danger to the Plaintiff, the Plaintiff has not shown that the Defendant Officers' failure to protect the Plaintiff "shock[s] the conscience." "[S]tate action that shocks the conscience is conduct which may be deemed 'arbitrary in the constitutional sense.'" *Jackson*, 653 F.3d at 654 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). This requirement is satisfied by "only 'the most egregious official conduct.'" *Id.* (quoting *Lewis*, 523 U.S. at 846). The Seventh Circuit has held that "even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation." *Id.* at 654–55; *see also Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015) ("Neither bad decision-making nor grossly negligent behavior meets the stringent test." (citations omitted)).

In *Jackson*, a school principal asked a teacher to go speak with a student who was prone to acts of violence, even though the principal was aware the student had harmed teachers in the past, the principal considered the student to be strong, and the principal knew the student was in the midst of a violent outburst or had recently de-escalated from one. 633 F.3d at 655. The student swung a chair at the teacher, who, after a struggle, fell backward and hit her head on a white board and neck on the chalk ledge of the board. *Id.* at 653. The Seventh Circuit found that the principal's behavior did not shock the conscience because many of the student's acts of violence were not against other people, but were against himself, evaluation reports did not show a fear of the student harming the evaluators, regular evaluations showed the student's incidents were becoming less frequent and that he was trending toward verbal, rather than physical, outbursts, and the principal went to the student's room before the teacher and did not leave until

he felt the student had calmed down. *Id.* at 655–66. The court held that "although the [principal's] actions may well have been short-sighted, flawed, negligent, and tortious, they do not satisfy the standard for finding a constitutional violation." *Id.* at 656.

Neither do the Defendant Officers' actions satisfy the standard for finding a constitutional violation. Officer Sanchez testified that he did not know who Defendant Bell was yelling at. He testified that Defendant Bell took off running in a split second and without warning. As in *Jackson*, there was no clear indication the Plaintiff would be harmed: the evaluators in *Jackson* did not report any fear that the student would harm them, and here the Plaintiff did not express any fear of Defendant Bell to the Defendant Officers, nor was there warning that Defendant Bell would take off running. Officer Sanchez testified that Defendant Bell did not get physical with him, nor did he need to get physical to calm Defendant Bell down. Officer Sanchez also testified that there was no indication leading him to believe Defendant Bell would do anything, nor was there any indication, once Defendant Bell stop yelling, that he was going to run from where he was standing. The Seventh Circuit in *Jackson* found persuasive the fact that the principal, before sending the teacher in, stayed with the student until he felt the student had calmed down. The Defendant Officers similarly attempted to calm Defendant Bell down throughout the fifteen-minute incident. Even if the facts demonstrated that the Defendants Officers "just stood by and did nothing to prevent private violence," which the facts do not show, to prove a State-created danger the Plaintiff must show that "the state did something that turned a potential danger into an actual one." *Doe*, 782 F.3d at 917. Without such a showing that the Defendant Officers' behavior created or increased a danger to the Plaintiff in a manner that shocked the conscience, the Court cannot say that the Defendants are liable to the Plaintiff under the State-created danger theory.

The Plaintiff has thus failed to demonstrate that either the special relationship or State-created danger exception applies to the instant facts. As a result, he cannot show that the Defendant Officers had a duty to protect him from Defendant Bell's attack. The State's "failure to protect [the Plaintiff] against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.

Further, absent a constitutional violation on the part of the Defendant Officers, the Plaintiff cannot establish a constitutional violation on the part of the Defendant City. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) ("[L]ocal governments . . . may be sued for *constitutional deprivations* . . . ." (emphasis added)); *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))). Accordingly, the Court grants both the Defendant Officers' and the Defendant City's motions for summary judgment.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendants East Chicago Police Officers' Motion for Summary Judgment [ECF No. 76] and Defendant, City of East Chicago's, Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 and N.D. Ind. L.R. 56-1 [ECF No. 79]. The Court DIRECTS the Clerk of Court to enter judgment in favor of the Defendants Louis Arcuri, Jr., Arcides Santiago, Je Sanchez, Sayra Jiminez-Segovia, and the City of East Chicago, and against the Plaintiff Brian Schaap. Count I of the Plaintiff's Second Amended Complaint remains pending against Defendant Benyama Donte Morman Bell.

As noted in the Court's March 23, 2022 Order [ECF No. 73], now that the case is resolved as to the Defendant Officers and the City of East Chicago, the Plaintiff is granted leave to file a motion for default judgment against Defendant Benyama Donte Morman Bell, for whom there has been an entry of default. The Plaintiff is granted up to and including August 14, 2023, to file the motion.

SO ORDERED on July 12, 2023.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT